UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

LAKEISHA LESESNE, as mother and next
friend of B.F., a minor,

    Plaintiff,

      v.

DISTRICT OF COLUMBIA, *et. al.*,

    Defendants.

Civil Action No. 04-0620 (CKK)

**MEMORANDUM OPINION**
(July 26, 2005)

    Plaintiff Lakeisha LeSesne, on behalf of her minor son, B.F., brought this action under

the Individuals with Disabilities Education Act ("IDEA" or "the Act"), 20 U.S.C. § 1400 *et. seq.*,

and D.C. Code § 38-2501, against Defendants, the District of Columbia and Ms. Elfreda Massie,

the Interim Superintendent of the District of Columbia Public Schools ("DCPS").  The IDEA

provides that all children with disabilities will be provided a free and appropriate public

education ("FAPE"), and provides for procedural safeguards to ensure that disabled children

receive individualized education programs ("IEP") to fulfill the Act's goals.  Plaintiff's son was

identified as requiring an IEP, and after the DCPS apparently failed to meet its procedural

deadline to create one, Plaintiff filed for an administrative due process hearing under 20 U.S.C. §

1415(f).  The question for the hearing was not whether the preexisting IEP was inappropriate, but

whether to order one to be created.  The Hearing Officer ("H.O.") mooted the proceedings after

learning that Defendant had already attempted to set up an IEP meeting with Plaintiff prior to the

hearing.  Plaintiff then filed an appeal in this Court asking for (1) an injunction ordering DCPS to

develop an IEP and compensatory education plan for her son; (2) an injunction ordering DCPS to place B.F. in an appropriate school; and (3) a declaratory judgment that DCPS failed timely to develop an IEP and make a placement.  *See generally* Compl.  Under Section 1415(i)(2) of the IDEA, any party "aggrieved by the findings and decisions" of the due process hearing may bring a civil action in a federal district court.

This matter is now before the Court on Plaintiff's Motion for Summary Judgment ("Pl.'s Summ. J. Mot.") and Defendants' Cross-Motion for Summary Judgment ("Defs.' Summ. J. Mot.").  Defendants argue that the hearing officer's decision ("H.O.D.") was correct and must be upheld.  Plaintiff asks for summary judgment, declaring that the proceeding was not moot and B.F.'s rights were violated.  Upon a searching consideration of the Motions, Oppositions, the relevant case law, and the administrative record, the Court shall deny Plaintiff's Motion for Summary Judgment and grant Defendants' Motion for Summary Judgment.

## I: STATUTORY FRAMEWORK

The purpose of the IDEA is "to ensure that all children with disabilities have available to them a free appropriate public education ["FAPE"] that emphasizes special education and related services designed to meet their unique needs . . . ." 20 U.S.C. § 1400(d)(1)(A).  "Implicit" in the IDEA's guarantee "is the requirement that the education to which access is provided be sufficient to confer some educational benefit upon the handicapped child."  *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester County v. Rowley*, 458 U.S. 176, 200, 102 S. Ct. 3034, 73 L.Ed. 2d 690 (1982).

As a condition of funding under the IDEA, the Act requires school districts to adopt procedures to ensure appropriate educational placement of disabled students.  *See* 20 U.S.C. §

1413.  School districts must also develop comprehensive plans for meeting the special

educational needs of disabled students.  *See* 20 U.S.C. § 1414(d)(2)(A).  These plans, known as

IEPs, must include a written "statement of the child's present levels of educational performance,

. . . a statement of the measurable annual goals, [and] a statement of the special education and

related services . . . to be provided to the child."  *See* 20 U.S.C. § 1414(d)(1)(A).

A student's eligibility for a FAPE under the IDEA is determined by the results of testing

and evaluating the student, and the findings of a "multidisciplinary team" and/or "individualized

educational plan team" ("MDT/IEP team").  Such a team consists of the parents and teachers of

the disabled student, as well as other educational specialists, who meet and confer in a

collaborative process to determine how best to accommodate the needs of the student and

provide a FAPE.  *See* 20 U.S.C. § 1414(d)(1)(B).  In the case of a child whose behavior impedes

his or her learning or that of others, the IEP team shall consider "when appropriate, strategies,

including positive behavioral interventions, strategies, and supports to address that behavior."  *Id.*

§ 1414(d)(3)(B)(i).  The federal regulations interpreting the IDEA require that a meeting to

develop an IEP be held within thirty (30) days of the determination of a child's need for special

education and related services.  34 CFR § 300.343(b)(2).[1]  The District of Columbia's regulations

follow suit.  5 D.C. Mun. Regs. § 3007.1.

---

[1] On November 13, 2003, the District of Columbia amended the statute that required
DCPS to assess and evaluate a student who may have a disability and who may require special
education services, changing the amount of time allotted for completion of the evaluation from
sixty (60) days to one hundred and twenty (120) days.  *See* D.C. Code § 38-2501.  The amended
statute allots one hundred and twenty (120) days within learning of a child's disability to locate
an appropriate placement.  *Id.* §§38-2501(a) & (b).

The IDEA also guarantees parents of disabled children the opportunity to participate in the evaluation and placement process. *See* 20 U.S.C. § 1414(f), 1415(b)(1). "The IEP team shall conduct an initial evaluation of a child within a reasonable time of receiving a written referral and parental consent to proceed within timelines consistent with Federal law and D.C. Code § 38-2501(a)." 5 D.C. Mun. Regs. § 3005.2. The regulations require DCPS to use "a variety of assessment tools and strategies" to gather "relevant functional and developmental information about the child." *Id.* § 3005.9(b). Parents who object to their child's "identification, evaluation, or educational placement" are entitled to an impartial due process hearing, *see* 20 U.S.C. §§ 1415(b)(6), (f)(1), at which they have a "right to be accompanied and advised by counsel," 20 U.S.C. § 1415(h)(1). A qualified impartial hearing officer conducts the due process hearing in accordance with the Act. 5 D.C. Mun. Regs. § 3030.1. Under the IDEA, a party is entitled to attorney's fees and costs if he or she is a "prevailing party." 20 U.S.C. § 1415(i)(3)(B). To be the prevailing party, one must gain a "material alteration of the legal relationship of the parties" and gain a judgment on the merits. *Bridgeforth v. Dist. of Columbia*, 933 F. Supp. 7, 10 (D.D.C. 1996).

Parents "aggrieved by" a hearing officer's findings and decision may bring a civil action in either state or federal court. 20 U.S.C. § 1415(i)(2); 5 D.C. Mun. Regs. § 3031.5. The district court has remedial authority under the Act, and broad discretion to grant "such relief as the court determines is appropriate" under the IDEA as guided by the goals of the Act. 20 U.S.C. § 1415(i)(2)(B)(iii).

## II: FACTUAL BACKGROUND

B.F. is a sixteen-year-old boy residing in the District of Columbia and is a student in the DCPS system.[2]  On September 15, 2003, the Child Guidance and Family Counseling Clinic of the Social Services Division of the Superior Court of the District of Columbia performed a psychological evaluation of him in order to address B.F.'s repeated involvement with the juvenile justice system.  Compl. ¶ 7; R. at 12-23 (Sept. 15, 2003 Confidential Psychological Evaluation). The evaluation performed by the Superior Court identified B.F. as mentally retarded, cannabis dependent, and suffering from various psychological and social problems.  Compl. ¶ 8; Defs.' Stmt. of Mat. Facts ¶ 3; R. at 22.  The test evaluation also found that B.F.'s verbal and performance IQ scores are in the first percentile with other adolescents his age.  Pl.'s Stmt. of Mat. Facts ¶ 4; R. at 17-18.  B.F.'s cognitive deficiencies contribute to his frequent behavioral problems.  Defs.' Stmt. of Mat. Facts ¶ 5; R. at 17-18, 22.  On these facts, the evaluator recommended a special education program and an IEP be developed for B.F, but did not purport to define what process must be followed by the DCPS to develop such an IEP.  Defs.' Stmt. of Mat. Facts ¶ 4; Pl.'s Stmt. of Mat. Facts ¶ 6; R. at 23 ("**Recommendations** . . . . Assign an education advocate and an IEP to identify special education needs in an attempt to create an educational plan, which will maximize [B.F.'s] academic, social, and vocational skills.").  At the time the evaluation was conducted, B.F. was a fourteen (14) year old seventh grade student at Fletcher-Johnson Educational Center ("Fletcher-Johnson") in the District of Columbia.  Pl.'s Stmt. of Mat. Facts. ¶ 11.  He was repeating the seventh grade due to repeated absences the year before.  H.O.D. at 16.

---

[2] B.F. was born on July 21, 1989.

DCPS received the evaluation on October 30, 2003 when Ms. Zuckerman, B.F.'s court-appointed special education advocate in his juvenile court matter, faxed the psychological evaluation to Ms. Ally Thompson, a Special Education Coordinator at Fletcher-Johnson.  Defs.' Stmt. of Mat. Facts. ¶ 5.  Ms. Thompson then met with a psychologist and speech therapist to discuss further testing that was needed before B.F. could be evaluated for a possible IEP.  *Id.* ¶ 6; *see also* 3/5/04 Admin. Hearing Tr. at 24:15-17 (after getting the information on October 30, 2004, Ms. Thompson testified that she "then met with our psychologist and our speech therapist and I informed them that we needed to complete the testing that they were requesting").  Importantly, speech testing -- which had not been performed by the Child Guidance and Family Counseling Clinic in September -- was required prior to the development of an IEP.  *See* 3/5/04 Admin. Hearing Tr. at 30:10-21.

Despite this clear need for more testing of B.F., Ms. Thompson described her daily attempts to get B.F. tested as "hard," 3/5/04 Admin. Hearing Tr. 26:10, and noted that B.F. was uncooperative.  Defs.' Stmt. of Mat. Facts. ¶¶ 8-10 (Ms. Thompson "begged" B.F. personally to cooperate, but her progress was hampered by the fact that B.F. did not often come to school, and when he did, he was often not where he was supposed to be).[3]  Ms. Thompson enlisted the assistance of B.F.'s special education advocate and B.F.'s probation officer, and also attempted to garner the aid of his mother.  *Id.* ¶ 10; *see also* 3/5/04 Admin. Hearing Tr. at 25:10-19 (Ms. Thompson called Ms. LeSesne at least weekly, and Ms. LeSesne promised to show up to assist on several occasions, but failed to do so for at least three (3) weeks).  After repeated warnings

---

[3] Ms. Thompson's efforts were further complicated by B.F.'s arrest on battery charges during the middle of one round of testing; this arrest interrupted the testing process and further delayed B.F.'s complete evaluation.  *See* 3/5/04 Admin. Hearing at 25:10-26:21.

that Ms. Thompson would report the lack of cooperation to his probation officer, B.F. agreed to complete his speech testing. *Id.* ¶ 15. Finally, on January 26, 2004, DCPS conducted its own evaluations, including a Social History Review Summary Report that recommended that B.F. undergo IQ testing and receive a Vineland Adaptive Behavior Scale evaluation. *Id.* ¶ 7; R. at 26 (DCPS Social History Review Summary Report for B.F. dated 1/16/04).

Upon completion of this round of testing, Ms. Thompson felt that more testing was needed to be done on B.F. because the January 26, 2004 results showed that he may be able to perform on, near, or well-above grade level in several areas of academic achievement. *See id.* Despite the fact that further testing was still necessary, Ms. Thompson consulted her supervisor, Ms. Hilton, about the possibility of convening a meeting to determine B.F.'s eligibility for special education services. Def.'s Stmt. of Mat. Facts ¶ 7. Ms. Hilton, upon reflection, told Ms. Thompson, "Have the meeting anyway and indicate that we've tried to test him and we haven't completed the test." 3/5/04 Admin. Hearing Tr. at 28:4-6. On February 10, 2004, Ms. Caroline Houck, a newly-retained attorney for Plaintiff, contacted Ms. Thompson for the first time about the need to set up an IEP meeting for B.F. 3/5/04 Admin. Hearing Tr. at 26. During her conversation with Ms. Houck, Ms. Thompson informed Ms. Houck of B.F.'s pattern of uncooperative behavior, described the tests still needed, and faxed all pertinent information to Ms. Houck. *Id.* Rather than assist Ms. Thompson's efforts, on the following day -- February 11, 2004 -- Plaintiff's new counsel filed a request for a due process hearing with an independent hearing officer, requesting as relief that DCPS (1) immediately develop an IEP for B.F., (2) determine an appropriate placement, (3) perform all necessary evaluations, and (4) provide compensatory education. Defs.' Stmt. of Mat. Facts ¶¶ 8-9. Plaintiff's February 11, 2004

request for a "Due Process hearing," pursuant to 20 U.S.C. §§ 1415(b)(6), (f)(1), alleged that

DCPS had made no attempt to convene a meeting to develop an IEP for B.F., or to determine an

appropriate school placement for him.  Compl. ¶ 10.

On February 24, 2004, Ms. Thompson faxed a Letter of Invitation to Plaintiff's counsel,

proposing three dates, February 27, March 1, or March 3, for a MDT/IEP meeting.  Defs.' Stmt.

of Mat. Facts ¶ 20.  Plaintiff's counsel rejected all dates by fax on February 26, 2004, stating that

at least one week's notice was required and asked for three more dates.[4]  *Id.* ¶ 21.  That same day,

after receiving the fax, Ms. Thompson responded by suggesting March 8, 9, or 10 -- all of which

met the timing condition set by Plaintiff's counsel.  *Id.* ¶ 24. Plaintiff offered no response before

an administrative hearing was held on March 5, 2004, by an independent H.O.

After the March 5, 2004 administrative hearing, the H.O. issued his Hearing Officer's

Determination ("H.O.D.") on March 19, 2004, which dismissed the case and denied all relief.  As

reasons for the dismissal, the H.O. found that the proceeding was mooted because DCPS had

made reasonable efforts before the hearing to schedule an MDT meeting, and those efforts were

frustrated by Plaintiff's counsel.  H.O.D. at 6.  Indeed, the transcript from the hearing indicates

that Plaintiff's counsel chose to wait for the official hearing primarily in order to win attorney's

fees allotted by the statute.  *See* 20 U.S.C. § 1415(i)(3)(B); 3/5/04 Admin. Hearing Tr. 9:1-9

(Plaintiff's counsel: "this is strictly a procedural thing . . . what they're doing is forcing the parent

to expend attorney's fees to get something done"), 10:21-11:3 (Plaintiff's counsel: "what they do

is they force the parent to--I mean in this case.  I'm talking about this case.  The parent expends

attorney's fees.  The parent is entitled to reimbursement under the act but DCPS is . . . ."), 12:4-8

---

[4] March 3, 2004 was eight (8) days after February 24, 2004.

8

(H.O: "I'm not concerned about your attorney's fees.  When the special ed coordinator sends out an IEP letter trying to set up a meeting, I expect somebody on petitioner's side to treat that invitation seriously. . . ."), 13:5-19 (H.O.: "You're talking attorney's fees again.", Plaintiff's counsel admits:  "I am but it's an issue.  It's the issue --", H.O.: "Excuse me.  Let me explain something to you.  The Hearing Officer doesn't litigate attorney's fees.").

The Hearing Officer, Mr. Terry Banks, Esq., immediately objected to Plaintiff's tactics at the hearing, noting that

> My only complaint is that when it looks like a solution is in play I'm still sitting here despite the fact that you're here looking for an IEP meeting, an invitation has been sent and rather than calling . . . the school, apparently Ms. Houck [counsel for Plaintiff] wrote a letter and complained about the dates instead of picking up the phone and working out dates.  So I've got to sit here and referee what seems not to be a very serious FAPE.

3/5/04 Admin. Hearing Tr. at 9:17-10:4.  As such, the Hearing Officer dismissed Plaintiff's action because (1) the necessary testing could not be completed given B.F.'s "persistent absence from school," (2) Plaintiff's attorney frustrated, rather than facilitated efforts, to schedule an MDT/IEP meeting, and (3) "[t]he pendency of a Hearing Request does not justify an attorney's refusal to cooperate to schedule an MDT meeting."  H.O.D. at 4.  On April 14, 2004, Plaintiff filed her Complaint for injunctive relief and declaratory judgment in the United States District Court for the District of Columbia, seeking to reverse the Hearing Officer's ruling.  The motions from that Complaint are the subject of this Opinion.

In addition to the pending suit in this Court, on July 14, 2004 -- following the H.O.'s dismissal of Plaintiff's administrative case and the filing of this Compliant -- Plaintiff filed a Due Process Hearing request with the DCPS.  Pl.'s Mot. for Summ. J. Ex. 1 at 1.  The requested

Hearing was convened on August 19, 2004 pursuant to the IDEA, P.L. 101-476, as amended by

P.L. 105-17, the Rules of the Board of Education of the District of Columbia and the D.C.

Appropriations Act, Section 145, effective October 21, 1998. *Id.* A second Due Process Hearing

Officer ("second H.O.") issued an Order continuing the matter for a hearing on the merits on

September 21, 2004. *Id.* at 2. The Order also required DCPS, on or before September 2, 2004,

to convene an MDT/IEP placement meeting to determine a placement for the student or to

identify an interim placement. *Id.* On September 21, 2004, the second H.O. found that the

parties reached an "on the record" agreement in the best interest of the student, which placed B.F.

on an interim basis at the Spingarn Center. Pl.'s Mot. for Summ. J. Ex. 2 at 2. The second H.O.

issued an Order on September 22, 2004, requiring DCPS to convene an MDT/IEP meeting to

review B.F.'s evaluations, review, and revise the student's IEP as necessary; DCPS was then to

discuss and determine placement and compensatory education if warranted within thirty (30)

days. *Id.* The Order was the final administrative decision on the matter, allowing for appeals on

legal grounds made to a court of competent jurisdiction within thirty (30) days of the rendered

decision. *Id.*

### III: STANDARD OF REVIEW

    *A.    Summary Judgment Standard*

    A party is entitled to summary judgment if the pleadings, depositions, and affidavits

demonstrate that there is no genuine issue of material fact in dispute and that the moving party is

entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Tao v. Freeh*, 27 F.3d 635, 638

(D.C. Cir. 1994). Under the summary judgment standard, Defendant, as the moving party, bears

the "initial responsibility of informing the district court of the basis for [its] motion, and

identifying those portions of the pleadings, depositions, answers to interrogatories, and

admissions on file, together with the affidavits which [it] believe[s] demonstrate the absence of a

genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91

L.Ed.2d 265 (1986).  Plaintiff, in response to Defendants' motion, must "go beyond the pleadings

and by [his] own affidavits, or depositions, answers to interrogatories, and admissions on file,

'designate' specific facts showing that there is a genuine issue for trial." *Id.* at 324 (internal

citations omitted).

　　　　Although a court should draw all inferences from the supporting records submitted by the

nonmoving party, the mere existence of a factual dispute, by itself, is not sufficient to bar

summary judgment.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91

L.Ed.2d 202  (1986).  To be material, the factual assertion must be capable of affecting the

substantive outcome of the litigation; to be genuine, the issue must be supported by sufficient

admissible evidence that a reasonable trier-of-fact could find for the nonmoving party.

*Laningham v. U.S. Navy*, 813 F.2d 1236, 1242-43 (D.C. Cir. 1987); *Liberty Lobby*, 477 U.S. at

251, 106 S.Ct. 2505 (the court must determine "whether the evidence presents a sufficient

disagreement to require submission to a jury or whether it is so one-sided that one party must

prevail as a matter of law").  "If the evidence is merely colorable, or is not sufficiently probative,

summary judgment may be granted."  *Liberty Lobby*, 477 U.S. at 249-50, 106 S.Ct. 2505

(internal citations omitted).  "Mere allegations or denials in the adverse party's pleadings are

insufficient to defeat an otherwise proper motion for summary judgment."  *Williams v.*

*Callaghan*, 938 F. Supp. 46, 49 (D.D.C. 1996).  The adverse party must do more than simply

"show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus.*

*Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Instead, while the movant bears the initial responsibility of identifying those portions of the record that demonstrate the absence of a genuine issue of material fact, the burden shifts to the non-movant to "come forward with 'specific facts showing that there is a *genuine issue for trial*.'" *Id.* at 587, 106 S.Ct. 1348 (citing Fed. R. Civ. P. 56(e)) (emphasis in original).

      B.     *Review of an Administrative Decision Under the IDEA*

      The IDEA permits "any party aggrieved by the findings and decision" rendered during administrative proceedings to "bring a civil action" in state or federal court without regard to the amount in controversy. 20 U.S.C. § 1415(i)(2); 34 C.F.R. § 300.512(b)(3). The reviewing court "shall receive the records of the administrative proceedings, shall hear additional evidence at the request of a party, and, basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C); 34 C.F.R. § 300.512(b)(3). In a review of an H.O.D., the burden of proof is always on the party challenging the administrative determination, who must "at least take on the burden of persuading the court that the hearing officer was wrong, and that a court upsetting the officer's decision must at least explain its basis for doing so." *Reid v. Dist. of Columbia*, 401 F.3d 516, 521 (D.C. Cir. 2005) (quoting *Kerkam v. McKenzie*, 862 F.2d 884, 887 (D.C. Cir. 1988)).

      The Supreme Court has interpreted the "preponderance standard of review not to be an allowance of unfettered *de novo* review." *Id.* (quoting *Rowley*, 458 U.S. at 206, 102 S. Ct. 3034). Courts must give administrative proceedings "due weight," *id.*, and "[f]actual findings from the administrative proceedings are to be considered prima facie correct." *Id.* (quoting *S.H. v. State-Operated Sch. Dist. of the City of Newark*, 336 F.3d 260, 270 (3d Cir. 2003)). Courts may not

substitute their own views for those of the hearing officer, *see Rowley*, 458 U.S. at 206, 102 S.

Ct. 3034; *Shaw v. Dist. of Columbia*, 238 F. Supp. 2d 127, 135 (D.D.C. 2002), and a court

upsetting a hearing officer's decision "must at least explain its basis for doing so." *Dist. of*

*Columbia v. Ramirez*, --- F. Supp. 2d ----, 2005 WL 1540798, at *3 (D.D.C. July 1, 2005)

(quoting *Kerkam*, 862 F.2d at 887).   However, the statute also suggests "less deference than is

conventional in administrative proceedings," *Reid*, 401 F.3d at 521, since the district court is

allowed to hear additional evidence at the request of the party.   20 U.S.C. § 1415(i)(2)(C)(ii).

When no additional evidence is introduced in a civil suit seeking review of an H.O.D., a motion

for summary judgment operates as a motion for judgment based on the evidence comprising the

record.   20 U.S.C. § 1415(i)(2)(B); *Ramirez*, --- F. Supp. 2d ----, 2005 WL 1540798, at *3.

## IV: DISCUSSION

Both parties are asking for summary judgment on a matter that the Court has determined,

from the filings and administrative record, has already been resolved.   B.F. is currently in a new

educational placement following a second due process hearing held in September 2004.   Pl.'s

Summ. J. Mot. Ex. 2.   The parties have already met and discussed B.F.'s situation and the record

provides no indication that either the placement is inappropriate, or that an IEP has not been

created.   *Id.*   Regardless, Plaintiff is still asking for a summary judgment and for the Court to find

that despite DCPS's efforts to set up an MDT/IEP meeting prior to the initial due process

hearing, the doctrinal exception to mootness recognized in *Zearly v. Ackerman*, 116 F. Supp. 2d

109 (D.D.C. 2000), applies.   Regardless of whether the proceeding was moot, Plaintiff asks the

Court to focus on the procedural delays to find that B.F.'s IDEA rights were violated.

A.      *The Hearing Officer Correctly Found the Due Process Hearing Moot*

Mootness arises when the issues are no longer live or the parties lack a cognizable interest in the outcome. *Zearly*, 116 F. Supp. 2d at 112. The *Zearly* Court determined that for an IDEA proceeding, an action is not moot if "(1) the challenged action [is] in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there [is] a reasonable expectation that the same complaining party [will] be subjected to the same action again." *Id.* (quoting *United States v. Weston*, 194 F.3d 145, 148 (D.C.Cir. 1999)) (internal quotations omitted). As the IEP must be continuously evaluated under the law, 20 U.S.C. § 1414(d)(4)(A), the grounds for challenging one may fall into these categories. *See Zearly*, 116 F. Supp. 2d at 112 (finding DCPS's actions over the course of three years met both prongs of the test).

The ultimate goal in any proceeding under the IDEA is to ensure that the child at the center of it receives the education he or she is due under the law. Under the IDEA, every disabled child must be offered a "free appropriate public education." 20 U.S.C. § 1414(a)(2)(4). To determine whether an H.O. erred in its decision and a child has been deprived of such an education, "a court must determine whether (1) the state complied with the procedures set forth in the IDEA and, (2) the [IEP] developed through the Act's procedures is reasonably calculated to enable the child to receive educational benefits." *Zearly*, 116 F. Supp. 2d at 113 (citing *Rowley*, 458 U.S. at 205-07, 102 S. Ct. 3034). The procedures set forth in the IDEA encompass a detailed and thorough description:

> The IDEA requires that all states receiving federal assistance under the Act: (1) provide FAPE to all children in the state between the ages of 3 and 21; (2) establish a goal of providing *full educational opportunity* to children with disabilities and a *detailed timetable* for accomplishing that goal; (3) regardless of the severity of the disability, *identify*, locate, evaluate, *develop*, provide and

*implement* practical remedial measures to children who are in need of special
education and related services; (4) provide an *individualized education program*
("IEP"), or an individualized family service plan that meets the requirements of
[1436(d)] that is *developed, reviewed, and revised to meet the changing needs of
the child;* (5) provide remedial education in the least restrictive environment, i.e.,
with children who are not learning disabled; and (6) provide additional
requirements that do not otherwise violate this Act.

*Diatta v. District of Columbia*, 319 F. Supp. 2d 57, 62-63 (D.D.C. 2004) (citing 20 U.S.C. §
1412(a)(1)-(5)) (emphasis in original).  Before an IEP is created, the court cannot evaluate the
second prong of *Rowley*, whether the child will reasonably receive any educational benefits.  *See*
458 U.S. at 207.

If there is an impetus to create an IEP on the part of the public school system, asking the
district court to intervene before one exists appears premature.[5]  Here, a child was in need of an
IEP.  B.F. was diagnosed with a developmental disorder and mild mental retardation.  Pl.'s Stmt.
of Mat. Facts. ¶¶ 3-5; Defs.' Stmt. of Mat. Facts ¶ 3.  His behavioral problems were interfering
with his ability to receive an education.  He had repeated the seventh grade because of truancy,
H.O.D. at 16, and his excessive absences and misbehavior were preventing Fletcher-Johnson
from completing speech and language tests that would help determine how to treat him.  Defs.'
Stmt. of Mat. Facts ¶¶ 7-14.  Plaintiff's filing of an administrative hearing request prompted
DCPS to schedule an IEP/MDT meeting to advance B.F.'s situation.  Under the local District of
Columbia statute, this meeting should have taken place by December 30, 2003 without the threat
of administrative action by Plaintiff.  *See* D.C. Code § 38-2501.  While DCPS was in technical

---

[5] The Act seems to contemplate court action only as a last resort, after going through the
state agency channels to provide for the disabled child.  *See* 20 U.S.C. § 1415(i)(2).  Therefore,
asking the Court to intervene when the state public school system is putting together a plan of
action would seem to put the cart before the horse.

violation of the then-existing law on this point, the Court cannot condone (1) the uncooperative behavior by both B.F. and Plaintiff, which derailed the IEP process, and (2) Plaintiff's decision to postpone the DCPS's efforts at meeting simply to achieve a final judgment for the purposes of attorney's fees, as the administrative hearing transcript suggests.  3/5/04 Admin. Hearing Tr. 8:12-11:5.  The best interests of the client, B.F., would have been to accept the school's invitation and begin the process of creating the IEP, as opposed to waiting for the H.O. to order such a meeting.  Rather than find for the Plaintiff on the mootness point, the Court must agree with Defendant that DCPS's efforts to set up an MDT/IEP meeting, procedurally belated or not, required some response from Plaintiff's counsel before the hearing date.  The pattern of repeated, conscious avoidance of the strictures of the IDEA, present in *Zearly*, was absent here.  Instead, in this case, the due process meeting was mooted out because (1) the DCPS was already attempting to set up the very type of meeting Plaintiff was asking the H.O. to order, and (2) Plaintiff -- spurred on by a quest for attorney's fees -- was actively avoiding that meeting and postponing any progress until an Administrative Hearing on the matter.

      B.     *Failure to Meet Procedural Deadlines Does Not Indicate a Failure to Provide a FAPE*

The IDEA requires states to establish procedural safeguards for children with disabilities and their families.  20 U.S.C. § 1415(a).  The D.C. Code, before it was amended in November 2003, required assessment and evaluation of a student who may require special education services due to a disability within sixty (60) days of learning about the disability.  *See* D.C. Code § 38-2501 (1990) (amended Nov. 13, 2003).  Should a plaintiff file a complaint for a due process hearing, the Act requires the local educational agency to convene a meeting with the parents and

the relevant members of the IEP team within fifteen (15) days.  20 U.S.C. § 1415(f)(1)(B)(i).

The hearing must be held within thirty (30) days of the complaint, but only if the local agency

has not resolved the complaint to the satisfaction of the parents.  *Id.* § 1415(f)(1)(B)(ii).

Congress's emphasis on procedural requirements in the Act was to assure adequate

substantive content in an IEP.  *Rowley*, 458 U.S. at 206, 102 S. Ct. 3034.  Therefore, violations

of procedure are the first element a reviewing court must consider when determining whether the

state complied with the IDEA.  *See id.* at 206-07.  In some cases, a violation of the IDEA's

procedural guarantees may sufficiently prove that a school system "failed to provide a free

appropriate public education and thus has violated the Act."  *Blackman v. Dist. of Columbia*, 277

F. Supp. 2d 71, 79 (D.D.C. 2003) (quoting *Evans v. Bd. of Educ. of the Rhinebeck Cent. Sch.*

*Dist.*, 930 F. Supp. 83, 93 (S.D.N.Y. 1996)).  "The failure to provide an IEP, the failure to hold a

due process hearing, or the failure to provide a written determination in a timely manner after

request for an IEP meeting or a hearing have been made constitutes the denial of [FAPE]."  *Id.*

(citing *Walker v. Dist. of Columbia*, 157 F. Supp. 2d 11, 32 (D.D.C. 2001).

Procedural violations are not an automatic violation of FAPE.  *Simmons v. Dist. of*

*Columbia*, 355 F. Supp. 2d 12, 18 (D.D.C. 2004) (internal citations omitted).  In many cases, a

plaintiff must demonstrate "substantial harm" resulting from a procedural violation to establish

denial of FAPE.  *Id.*  In cases where a student is seeking a reevaluation, but is already in a

placement, a court may not find delay substantially harmed the child.  *See id.* at 17.  However, in

cases where there is no placement because "no hearing has been held and no determination has

been issued" preventing a proper placement, "there results a *per se* harm to the student and the

irreparable injury requirement for a preliminary injunction has been satisfied."  *Blackman*, 277 F.

17

Supp. 2d at 79.  While procedural delays cannot prejudice a child's educational opportunities, *see Shaw*, 238 F. Supp. 2d at 136, such delays must be "unnecessary and harmful" to a child's education to find denial of FAPE.  *Id.* at 144-45.  The ultimate goal is to provide for the child and if the school system complies, a violation of the IDEA does not occur.  *Shaw*, 238 F. Supp at 136 ("If a disabled child received (or was offered) a FAPE in spite of a technical violation of the IDEA, the school district has fulfilled its statutory obligations."(quoting *MM v. Sch. Dist. of Greenville County*, 303 F.3d 523, 534 (4th Cir. 2002)).

Here, DCPS was aware of the juvenile court system's recommendation to create an IEP since October 30, 2003, at the earliest.  Defs.' Stmt. of Mat. Facts ¶ 5.  When Plaintiff filed her initial request for a due process hearing on February 11, 2004, over sixty (60) days had passed and no IEP had yet been created for B.F.  By the first administrative hearing on March 5, 2004, DCPS was roughly two months delinquent in its IEP determination process.  *See* D.C. Code § 38-2501 (1990) (amended Nov. 13, 2003).  While there is no excuse for the DCPS's apparent delinquency, there were multiple mitigating factors to explain that delay.  Ms. Thompson contacted Plaintiff's counsel within the fifteen (15) day time period and had the parties met, there is certainly a chance that the matter could have been resolved; moreover, the intransigence of both B.F. and Plaintiff delayed needed testing that would have advanced his IEP process.  Defs.' Stmt. of Mat. Facts ¶ 20.  The Court cannot find that B.F. was *per se* harmed because no proper placement had been made by March 5, 2004.  *See Blackman*, 277 F. Supp. 2d at 79.  There was an impetus to hold a meeting in order to circumvent the hearing process.  Defs.' Stmt. of Mat. Facts ¶¶ 16, 20.  Testing was under way to ensure proper treatment and placement for B.F.  *Id.* ¶ 14.

Overturning the H.O.D.'s dismissal of Plaintiff's case because it failed to acknowledge that Defendants were in procedural violation of the IDEA misses the point of the Act -- to provide a free appropriate education.  20 U.S.C. §§ 1412(a)(1)-(5).  Holding out for a hearing where an administrative officer may order an IEP/MDT meeting when the invitation to such a meeting has already been sent further delays the process.  Furthermore, a new due process hearing was held and an IEP agreement was crafted before the beginning of the 2004-05 school year.  Pl.'s Summ. J. Mot. Ex. 2.  There is nothing on the record to indicate that B.F. continues to suffer prejudice to his educational opportunities since his enrollment at the Springarn Center.  Despite the technical violation, B.F. appears to be receiving a FAPE.

## V: CONCLUSION

Plaintiff has failed to show that the Hearing Officer's Determination was incorrect or that any material facts remain in dispute.  She therefore fails to meet her burden for summary judgment.  The record indicates that B.F.'s is in an educational placement that the parties agree is suitable for his disability and special education needs.  Since the child at the center of the matter is being provided for, any action against the DCPS is mooted.  For these reasons and those stated above, the Court grants Defendants' motion for summary judgment and denies Plaintiff's motion for summary judgment.  An Order accompanies this Memorandum Opinion.


Date:   July 26, 2005


_____/s/_____
COLLEEN KOLLAR-KOTELLY
United States District Judge

19